1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MIGUEL A. MOLINA, | ) | 1:08-cv-01473-AWI-SMS |
| | ) | |
| Plaintiff, | ) | FINDINGS AND RECOMMENDATIONS RE: |
| v. | ) | PLAINTIFF'S SOCIAL SECURITY |
| | ) | COMPLAINT (DOC. 1) |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff, born in June 1984, is proceeding in forma pauperis and with counsel with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's application of September 21, 2005, for Supplemental Security Income benefits, in connection with which Plaintiff claimed to have been disabled since October 1, 2003,[1] due to mental problems, schizophrenia, hearing voices, inability to be around people, paranoia, and too much medication

---

[1] With respect to SSI, because SSI payments are made for a period beginning at the date of application, the onset date in an SSI case is ordinarily established as of the date of filing, provided that the claimant was disabled on that date. Soc. Sec. Ruling 83-20. Exceptions are where the evidence shows that the onset date was subsequent to the date of filing, or where there is a problem requiring ascertainment of duration. Id.

to work. (A.R. 45-55, 86-91.) The matter has been referred to the United States Magistrate Judge pursuant to 28 U.S.C.§ 636(b) and Local Rule 72-302(c)(15).

The decision under review is that of Social Security Administration (SSA) Administrative Law Judge (ALJ) Bert C. Hoffman, Jr., dated March 20, 2008 (A.R. 12-22), rendered after a hearing held on October 24, 2007, at which Plaintiff appeared and testified with the assistance of counsel (A.R. 12, 983-1034).[2] The Appeals Council denied Plaintiff's request for review on July 18, 2008 (A.R. 5-7), and thereafter Plaintiff filed his complaint in this Court on August 18, 2008. Briefing commenced on May 28, 2009, with the filing of Plaintiff's opening brief, and was completed with the filing of Respondent's cross-motion for summary judgment on June 29, 2009. The matter has been submitted to the Court without oral argument.

I. Standard and Scope of Review

This Court has jurisdiction of the underlying controversy pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g).

---

[2] Although the hearing is labeled as one occurring on October 24, 2005 (Court Transcript Index, A.R. 983, 985, 1034), the Court notes that in his decision, the ALJ referred to the date of the hearing as October 24, 2007 (A.R. 12). Further, Plaintiff's testimony to his date of birth in June 1984 and his age at the time of the hearing as twenty-three years (A.R. 986, 988), as well as testimonial references to medical records of treatment occurring in 2007 (A.R. 1029) render the 2005 date extremely unlikely. No other transcript of another hearing is reflected in the administrative record.

2

1  Substantial evidence means "more than a mere scintilla,"
2  Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a
3  preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10
4  (9th Cir. 1975). It is "such relevant evidence as a reasonable
5  mind might accept as adequate to support a conclusion."
6  Richardson, 402 U.S. at 401. The Court must consider the record
7  as a whole, weighing both the evidence that supports and the
8  evidence that detracts from the Commissioner's conclusion; it may
9  not simply isolate a portion of evidence that supports the
10 decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir.
11 2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).
12 It is immaterial that the evidence would support a finding
13 contrary to that reached by the Commissioner; the determination
14 of the Commissioner as to a factual matter will stand if
15 supported by substantial evidence because it is the
16 Commissioner's job, and not the Court's, to resolve conflicts in
17 the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th
18 Cir. 1975).

19      In weighing the evidence and making findings, the
20 Commissioner must apply the proper legal standards. Burkhart v.
21 Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must
22 review the whole record and uphold the Commissioner's
23 determination that the claimant is not disabled if the
24 Commissioner applied the proper legal standards, and if the
25 Commissioner's findings are supported by substantial evidence.
26 See, Sanchez v. Secretary of Health and Human Services, 812 F.2d
27 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If
28 the Court concludes that the ALJ did not use the proper legal

3

standard, the matter will be remanded to permit application of the appropriate standard. <u>Cooper v. Bowen</u>, 885 F.2d 557, 561 (9th Cir. 1987).

II. <u>Disability</u>

A. <u>Legal Standards</u>

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that the claimant is not only unable to do the claimant's previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability is initially on the claimant, who must prove that the claimant is unable to return to his or her former type of work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the

1  impairment, 2) whether solely on the basis of the medical
2  evidence the claimed impairment is severe, that is, of a
3  magnitude sufficient to limit significantly the individual's
4  physical or mental ability to do basic work activities; 3)
5  whether solely on the basis of medical evidence the impairment
6  equals or exceeds in severity certain impairments described in
7  Appendix I of the regulations; 4) whether the applicant has
8  sufficient residual functional capacity, defined as what an
9  individual can still do despite limitations, to perform the
10  applicant's past work; and 5) whether on the basis of the
11  applicant's age, education, work experience, and residual
12  functional capacity, the applicant can perform any other gainful
13  and substantial work within the economy. See 20 C.F.R. § 416.920.

14             B. The ALJ's Findings

15       The ALJ found that Plaintiff had severe impairments of
16  psychotic disorder and history of substance abuse which did not
17  meet or medically equal a listed impairment. (A.R. 14.) Plaintiff
18  retained the residual functional capacity to perform a full range
19  of work at all exertional levels but with non-exertional
20  limitations of being capable of simple, repetitive tasks with
21  limited public contact. (A.R. 15.) Having worked at various jobs
22  for very short periods of time, Plaintiff had no past relevant
23  work. However, as a younger person (aged twenty-one years at the
24  time of the application) with a limited education and ability to
25  communicate in English, and considering his education, age, work
26  experience, and residual functional capacity (RFC), there were
27  jobs that existed in significant numbers in the national economy
28  that Plaintiff could perform. (A.R. 21.) Plaintiff's ability to

1  perform work at all exertional levels had been compromised by
2  non-exertional limitations, but those limitations had little or
3  no effect on the occupational base of unskilled work at all
4  exertional levels. Thus, under the framework of § 204.00 in the
5  Medical-Vocational Guidelines, Plaintiff had not been under a
6  disability since September 21, 2005, the date the application was
7  filed. (A.R. 21.)

8      III. <u>Medical Record</u>

9      For several weeks in September and October 2003, Plaintiff
10 was hospitalized in Los Angeles for abnormal behavior and
11 symptoms of psychosis and movement disorder secondary to
12 substance abuse. It appeared that Plaintiff had used drugs while
13 in a rehabilitation program and had wandered away. (A.R. 782,
14 790.) Upon Plaintiff's admission to the hospital, an attending
15 physician diagnosed substance-induced movement disorder and
16 stimulant-induced hallucinations. (A.R. 613-933, 619-20.)
17 Plaintiff's history of stimulant and marijuana use was reported,
18 and his symptoms improved when he was no longer using illicit
19 stimulants. (A.R. 619.)

20     With respect to a longitudinal history of substance abuse,
21 Plaintiff admitted that he was using drugs when his strange
22 behavior and disorganization began. (A.R. 837.) In August 2004,
23 Plaintiff admitted that he had been using drugs, including
24 smoking methamphetamine, a year before, which was the time of his
25 lengthy hospitalization in 2003. (A.R. 207-08.) Plaintiff had
26 smoked marijuana. (A.R. 581-82.) In July 2005, he admitted that
27 he had not been taking his medications and was on cocaine at the
28 time of an armed robbery. (A.R. 236.) He reported in 2007 that he

had used methamphetamine beginning at age fifteen, using heavily after two years, and being addicted with daily use until arrested, at a rate of one/sixteenth ounce to an "eight ball" a day; he sold drugs to support his own habit. (A.R. 581-82.) In 2007 he stated that at the time of his most recent offense (grand theft), he had been under the influence for ten days straight without sleep. (A.R. 582.)

Plaintiff claimed in both October 2006 and February 2007 that he had been clean of drug use, including methamphetamine use, for three years. (A.R. 582, 949.) He also stated in 2007 that he had been off methamphetamine for four to five years. (A.R. 1007.) Further, various drug tests administered to Plaintiff had negative results. (See, e.g., A.R. 360 [3/27/07], 215 [8/5/04].) However, Plaintiff admitted in March 2007 that he last used "ice" four months before (which would be approximately November or December 2006), and his last drink was a month before, or in February 2007. (A.R. 590.) Further, at hearing he admitted that at a time about seven or eight months before the hearing of October 2007, he had inhaled marijuana smoke; he had subsequently reported it to his probation officer, but it did not precipitate a violation. (A.R. 1006-09.)

Plaintiff was briefly hospitalized at Tuolumne General Hospital from July 29, 2004, through July 30, 2004, at the behest of his mother, to whom he had declared an intention to kill himself. The physician who assessed Plaintiff's condition diagnosed schizophrenia, chronic, undifferentiated; personality disorder with anti-social features; and a GAF of 40 upon

1  admission and 55 upon discharge.[3] (A.R. 608-611, 596-611.)

2      Plaintiff was again hospitalized from August 5 through 13,

3  2004. From August 5, 2004, through August 7, 2004, Plaintiff was

4  at Fresno County Mental Health, and was thereafter discharged to

5  Kaweah Delta Behavioral Health Center. Plaintiff suffered

6  hallucinations during which he saw shadows and heard voices; he

7  complained that his medications (Risperdal and Depakote), were

8  not working and were making him fat and hungry, so he wanted new

9  medications. (A.R. 189-217, 211, 572-73, 191, 199, 208.) A

10 physician evaluated Plaintiff and diagnosed schizophrenia,

11 paranoid type, with a GAF of 50. Plaintiff did not appear

12 intoxicated. (A.R. 191, 572, 217.) At Kaweah Delta Hospital,

13 after evaluation at the outside hospital and PACT unit,

14 Plaintiff's symptoms included fear, auditory and visual

15 hallucinations, and misbehavior, including inappropriate touching

16 of his brother and an attempt to choke his mother. It was

17 reported that the Paxil and Depakote that Plaintiff had been

18 taking for about a month did not help; however, Plaintiff's

19 auditory symptoms decreased after Risperdal was started, although

20

21

22      [3]A GAF, or global assessment of functioning, is a report of a
    clinician's judgment of the individual's overall level of functioning that is
    used to plan treatment and to measure the impact of treatment as well as to

23  predict its outcome. American Psychiatric Association, Diagnostic and
    Statistical Manual of Mental Disorders at 32 (4th ed., text revision) (DSM-IV-
    TR). A GAF in the range of 41-50 indicates serious symptoms (e.g., suicidal

24  ideation, severe obsessional rituals, frequent shoplifting) or any serious
    impairment in social, occupational, or school functioning (e.g., no friends,

25  unable to keep a job). DSM-IV-TR at 34. A GAF of 55 (i.e., within the range of
    51 through 60), indicates moderate symptoms (e.g., flat affect and

26  circumstantial speech, occasional panic attacks) or moderate difficulty in
    social, occupational, or school functioning (e.g., few friends, conflicts with

27  peers or co-workers). Id. Neither SSA regulations or governing case law
    requires an ALJ to take a GAF score into consideration in determining the
    extent of disability. See, Howard v. Commissioner of Social Security, 276 F.3d

28  235, 241 (6th Cir. 2002).

8

1   it affected his movement. The diagnosis was schizophrenia,
2   undifferented type, neuroleptic-induced acute dystonia secondary
3   to Risperdal; medications (Haldahl, Ativan, and Benedryl) were
4   modified, and Plaintiff was given new medications upon discharge
5   (Abilify, Cogentin, and Clonazepam). At discharge Plaintiff was
6   calm and had coherent thoughts, fair concentration, and no
7   hallucinations. (A.R. 185, 550-53, 538, 408-10, 418.) Plaintiff
8   was released to the police and was ultimately returned to the
9   California Medical Facility. (A.R. 407, 418, 581.)

10      In mid-August 2004 Plaintiff reported to medical staff at
11  the California Department of Corrections that he suffered
12  auditory and visual hallucinations and paranoia. A physician
13  diagnosed schizophrenia, paranoid, and assessed a GAF of 55.
14  (A.R. 407-09, 265-67, 273.) In December 2004 at a different CDC
15  facility, Plaintiff was assessed as having amphetamine
16  dependence, in remission; substance-related disorder, not
17  otherwise specified, in remission; and a GAF of 45. (A.R. 255,
18  261.)

19      By December 30, 2004, Plaintiff stated that he used to hear
20  voices, but the medications he was receiving in custody worked
21  for him; he was fine and had no symptoms. A mental status exam
22  reflected fair concentration, good memory, and organized and
23  rational thoughts. He was very stable on his medication
24  (Aripiprazole, Isoniazid, and Pyridoxine) and was not in crisis.
25  (A.R. 254-56, 261.)

26      In June 2005, a review showed that Plaintiff was doing fine,
27  was compliant with his medications, and had no symptoms. The
28  diagnosis was psychotic disorder, not otherwise specified, in

1  remission, poly-substance dependence, and a GAF of 50. (A.R. 244-
2  47, 255.) In August 2005, a psychologist's progress notes
3  reflected that Plaintiff's mental disorder had stabilized, and
4  Plaintiff had not experienced any symptoms for numerous months.
5  Plaintiff was compliant with his medications and stated that the
6  medication was helpful. Plaintiff did not present a substantial
7  danger to himself or to others  (A.R. 244-47, 256, 259-61.)

8      Plaintiff was released from CMF Vacaville on August 13,
9  2005, and thereafter was evaluated by Ken Katz, L.C.S.W., at the
10 parole outpatient clinic on September 9, 2005. The assessment was
11 psychotic disorder, not otherwise specified, methamphetamine
12 dependence, early full remission, with a GAF of 50. (A.R. 228-
13 30.)

14     Katz reported that Plaintiff had been evaluated by Dr. Green
15 on September 2, 2005, who diagnosed schizophrenia, continued
16 Plaintiff's Seroquel, added Risperdal and Cogentin twice a day,
17 and scheduled follow-up in approximately seven weeks. (A.R. 229.)
18 No notes of this evaluation are in the record.[4]

19     On November 27, 2005, consulting examiner Frank Wilson, Jr.,
20 M.D., performed a psychiatric evaluation of Plaintiff at a time
21 when Plaintiff was living in a halfway house where he had to take
22 his medications. (A.R. 274-77.) Plaintiff reported that he took
23 his medications (Seroquel, Benzatropine, and Risperdal), and they
24 kept the voices from "coming alive." (A.R. 274.) Plaintiff
25 exhibited normal affect and thought process; he was oriented and
26 articulate. He did not appear to be reacting to internal stimuli

27

28

[4] At the hearing, the ALJ offered to issue a subpoena to obtain Dr. Green's treating notes. (A.R. 1028-33.) It does not appear that such notes have been put in the record.

during the examination. Dr. Wilson assessed substance-induced psychotic disorder in remission, secondary to methamphetamine abuse; anti-social personality traits; and a GAF of 68.[5] (A.R. 276.) Dr. Wilson opined that there was a clear causal relationship between Plaintiff's abuse of methamphetamine and his delusions. (A.R. 276.) Further, Plaintiff was able to maintain attention and concentration and carry out one-step or two-step, simple job instructions; could carry out an extensive variety of technical and/or complex instructions; and could relate and interact with co-workers, supervisors, and the general public as long as he was taking his medication. (A.R. 276.)

In February 2006, state agency medical consultant G. K. Ikawa, M.D., completed an RFC assessment relating to Plaintiff's psychotic disorder, NOS, and methamphetamine dependence in early full remission. He found that Plaintiff had moderate limitations with respect to restrictions of activities of daily living and maintaining social functioning, mild limitations in concentration, persistence, and pace, and no episodes of decompensation of extended duration. Plaintiff had moderate limitations in the capacity to understand, remember, and carry out detailed instructions, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes; otherwise, he

---

[5] A GAF of 68 indicates a person with some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but who is generally functioning pretty well and has some meaningful interpersonal relationships. DSM-IV-TR at 34.

was not significantly limited and was able to sustain simple, repetitive tasks, to relate as long as contact with coworkers and the public were limited , and to adapt. (A.R. 286-88, 278-88.)

In October 2006, Plaintiff returned to the Wasco facility of the CDC; he reported on intake that he was taking no medications, and he denied hearing voices or having hallucinations. (A.R. 947, 951.)

In January 2007, Plaintiff was released from Wasco after a six-month term relating to a parole violation; his parole discharge date was November 2008. (A.R. 581.) On February 4, 2007, when Plaintiff had been out of custody for about a week, he was hospitalized briefly for one day at Fresno County Mental Health for exhibiting hyperactive, nonsensical behavior, and dissociation. Plaintiff admitted that he was not compliant with his medication and that he had used alcohol. Plaintiff was discharged with medication (Seroquel, Hydroxyzine, Benztropine MES, and Risperdal) and was assigned a GAF of 60; he had no delusions at discharge. (A.R. 399, 388-405, 587, 393, 388.) In February 2007 Plaintiff was also evaluated by L.C.S.W. Katz in the parole system; he admitted that his medications improved his symptoms, although he still heard voices. His thinking was found to be adequately organized and goal-directed. The diagnosis was schizo-affective disorder, methamphetamine dependence in remission, history of cannabis use, and a GAF of 55. (A.R. 230, 583, 581-84.) Katz again evaluated Plaintiff in February 2007, when Plaintiff reported that his medication helped him be stable, although his symptoms remained. Katz assessed psychotic disorder, not otherwise specified, versus schizo-affective disorder;

12

methamphetamine dependence, in remission; history of cannabis
abuse; and a GAF of 55. (A.R. 581-83, 230.)

     Plaintiff was hospitalized for a week beginning March 18,
2007, at the Community Behavioral Health Center after it was
reported that he was hearing voices, seeing things, feeling
paranoid, and being aggressive. (A.R. 587-95, 354, 349-52, 593.)
Plaintiff admitted that he had not been taking his medications
for the past two to three months because they made him sad, and
they made him fat. (A.R. 589-90.) He reported that he needed to
be on SSI and that voices were telling him to hurt people,
especially if his SSI were not approved. (A.R. 367.) He was
discharged due to the absence of grounds for hospitalization, and
the recommendation was not to use drugs or alcohol. (A.R. 352.)
The diagnosis on admission was schizophrenia, chronic, paranoid
type; on discharge, the diagnosis was psychotic disorder NOS,
antisocial personality traits, and a GAF of 60. (A.R. 594, 587,
589.)

     On March 27, 2007, Dr. Green of the CDC parole outpatient
clinic wrote on a sheet from a prescription pad:

     I believe pt is unable to work at this time.
(A.R. 586.) On April 11, 2007, he wrote on another prescription
sheet:

     [PATIENT'S NAME Miguel Molina] Is disabled because
     of mental illness--psychosis.
(A.R. 585.)

     On May 1, 2007, Plaintiff was admitted for observation at
Fresno County Mental Health because he was delusional and
paranoid, and was discharged from Fresno County Behavioral Health
on May 2; Plaintiff appeared intoxicated; there appeared to be a

13

problem of alcohol withdrawal. Plaintiff was admitted to Fresno
County Mental Health on May 3, 2007, and on May 4 was assessed by
Dr. Mayur Amin, who diagnosed bipolar disorder, manic type,
severe with psychotic features, rule out schizophrenia, paranoid
type, with a GAF of 25.[6] Plaintiff was discharged to home with
medications on May 7, 2007. (A.R. 343-46, 330-39, 323, 310-15.)

On June 5, 2007, Plaintiff reported to Henry Green, M.D.,
that he was doing much better; he wanted to go to school and be
productive. There was no evidence of psychosis or hallucinations.
Medications were to continue. (A.R. 580.) Consistently, Mr. Katz
noted on June 21, 2007, that Plaintiff's illness waxed and waned
but that Plaintiff appeared better than Katz had ever seen him.
Plaintiff admitted that he perceived voices and shadows but that
they were not so bad; Katz reported that Plaintiff was
controlling his symptoms, and there was no evidence of psychosis.
(A.R. 579.) In July 2007, Plaintiff stated that he was compliant
with his medications, and he was reported to be developing
insight into his symptoms. (A.R. 579.) In August he tried to
detach himself from his symptoms and reported compliance with
medications. (A.R. 578, 580.)

On August 20, 2007, Plaintiff was briefly held at Fresno
County Mental Health pursuant to a self-referral based on wanting
to hurt himself and seeing and hearing demons; he was discharged
on August 21, 2007, to the hospital, from which he was ultimately

---

[6] A GAF of 21 through 30 indicates that behavior is considerably
influenced by delusions or hallucinations or serious impairment in
communication or judgment (e.g., sometimes incoherent, acts grossly
inappropriately, suicidal preoccupation), or that there is an inability to
function in almost all areas (e.g., stays in bed all day; no job, home, or
friends). DSM-IV-TR at 34.

14

discharged on August 23, 2007, with a diagnosis of schizophrenia, paranoid type. (A.R. 308-09, 296-98, 292.) His mental status at discharge was alert and oriented, calm, cooperative, with linear thought process, no hallucinations, full affect, and fair insight and judgment. He was released with Risperdal, Klonopin, and Cogentin, and with advice not to use alcohol or illicit drugs. (A.R. 294.)

On September 5, 2007, Plaintiff expressed no specific complaints to Dr. Green; his affect was appropriate, and there was no evidence of psychosis. (A.R. 581.) On September 26, 2007, parole outpatient clinic psychologist Wasserman noted that Plaintiff reported that he was stable with his symptoms of paranoia and auditory and visual hallucinations; Plaintiff said that he was taking his medications; he had too much time on his hands, which exacerbated his problems. (A.R. 577.)

IV. <u>Plaintiff's Testimony</u>

At the hearing, Plaintiff testified that he completed ninth grade in special education classes; he did not obtain a graduate equivalence diploma because of an inability to concentrate. (A.R. 988-89.) He had worked once for a few months as a produce clerk in connection with a vocational program, and he had learned to weld in high school. (A.R. 996.) He saw shadows, but his medications caused him to calm down and not react to them, although three times a month the medication would not work. He did not like to be around people and thought they were talking about him; however, if that angered him, he could control it by counting to ten. (A.R. 1010-11, 1014, 1018.) His daily activities included doing the dishes, mowing the lawn, cleaning his room,

1  doing laundry, working on and carrying on correspondence on the
2  computer, and going out with his mother and brother. (A.R. 1020-
3  21, 1023.) Dr. Green had told him that he could not work but
4  probably could go to school, and Plaintiff felt that he could not
5  work because of his illness; however, if a potential employer
6  wanted him to work, he would. (A.R. 1012-1014.)

7      V. <u>Expert Opinions</u>

8      Plaintiff challenges the ALJ's treatment of the "treating
9  physician medical records" from Fresno County Mental Health (A.R.
10 291-405 [records of treatment from February through August
11 2007]), the parole outpatient clinic (A.R. 575-86 [records of
12 treatment from 2007]), and Community Behavioral Health Center
13 (A.R. 587-95 [records of treatment from March 18 through 26,
14 2007]). (Pltf.'s Op. Brief at 3-4.) More specifically, Plaintiff
15 argues that the ALJ's giving significant weight to the 2005
16 opinion of consulting, examining physician Dr. Wilson was not
17 supported by clear and convincing reasons or substantial
18 evidence. Plaintiff contends that the report of the doctor who
19 examined Plaintiff once in 2005, at a time between fifteen and
20 twenty-one months before Plaintiff's later psychotic episodes,
21 was necessarily outweighed by the 2007 opinions of treating
22 physician Dr. Green and the medical evidence consistent with
23 those opinions. Plaintiff asserts that his impairment was
24 progressive in nature, and thus the earlier report was
25 meaningless and useless.

26     The standards for evaluating treating source's medical
27 opinions are as follows:

28             By rule, the Social Security Administration favors
               the opinion of a treating physician over

non-treating physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Id. § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Id. § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).

With respect to proceedings under Title XVI, the Court notes that an identical regulation has been promulgated. See, 20 C.F.R. § 416.927.

As to the legal sufficiency of the ALJ's reasoning, the governing principles have been recently restated:

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th Cir.1995) (as amended).] Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons

17

supported by substantial evidence in the record. <u>Id.</u>
(internal quotation marks omitted). Even if the
treating doctor's opinion is contradicted by another
doctor, the ALJ may not reject this opinion without
providing "specific and legitimate reasons" supported
by substantial evidence in the record. <u>Id.</u> at 830,
quoting <u>Murray v. Heckler</u>, 722 F.2d 499, 502 (9th
Cir.1983). This can be done by setting out a detailed
and thorough summary of the facts and conflicting
clinical evidence, stating his interpretation thereof,
and making findings. <u>Magallanes [v. Bowen</u>, 881 F.2d
747, 751 (9th Cir.1989).] The ALJ must do more than
offer his conclusions. He must set forth his own
interpretations and explain why they, rather than the
doctors', are correct. <u>Embrey v. Bowen</u>, 849 F.2d 418,
421-22 (9th Cir.1988).
<u>Reddick v. Chater</u>, 157 F.3d 715, 725 (9th Cir.1998);
accord <u>Thomas</u>, 278 F.3d at 957; <u>Lester</u>, 81 F.3d at
830-31.

<u>Orn v. Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007).

Further, a "medical opinion" is a statement from an
acceptable medical source that reflects a judgment about the
nature and severity of a claimant's impairments, including the
severity of the impairment, its symptoms, a diagnosis and
prognosis, a statement of what the claimant can still do despite
his or her impairments, and any physical or mental restrictions.
20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). A determination of
whether or not a claimant meets the statutory definition of
disability is a legal conclusion reserved to the Commissioner;
the opinion of a medical source on the ultimate issue of
disability is not conclusive. 20 C.F.R. §§ 404.1527(e)(1),
416.927(e)(1); <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir.
1989). A treating physicians's controverted opinion on the
ultimate issue of disability may be rejected by an ALJ if the ALJ
provides specific and legitimate reasons. <u>Holohan v. Massanari</u>,
246 F.3d 1195, 1202 (9th Cir. 2001).

In the decision before the Court, the ALJ reviewed

18

Plaintiff's subjective complaints of inability to focus, work, and tolerate others, and he listed Plaintiff's activities of daily living. (A.R. 15-16.) The ALJ then presented a detailed review of the longitudinal medical record for the period September 2003 through August 2007 (A.R. 16-19), and he adverted to the paucity of information for the year 2006 (A.R. 19).[7] The ALJ addressed Plaintiff's credibility, finding expressly that although Plaintiff's medically determinable impairment could reasonably be expected to produce the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the RFC because 1) Plaintiff's substance abuse initiated and/or exacerbated his mental disease, and Plaintiff had engaged in substance abuse during some of the times in which he had the psychotic episodes attended by hallucinations, paranoia, confusion, and disorganization; 2) Plaintiff's serious symptoms coincided with, and were generally tied to, Plaintiff's repeated failure to take his medications, but his symptom-free periods occurred during compliance with medication, during which Plaintiff had and would function quite well; 3) Plaintiff's activities of daily living were only mildly limited, and they and Plaintiff's reported interaction with others (reading as a hobby, spending time on the computer, going to dinner and movies with family, playing basketball) indicated only moderately limited ability to maintain concentration, persistence, or pace and moderate difficulties in social

---

[7] Medical records from the California Department of Corrections and USC Medical Center in Los Angeles County were submitted after the hearing and thus were before the Appeals Council. (A.R. 4, 616-982.) Records relating to the later period of treatment consist mainly of medication summaries.

functioning; and Plaintiff's episodes of decompensation were not
of extended duration according to Social Security standards.
(A.R. 19-20.)

Further, in the course of this analysis of Plaintiff's level
of functioning and Plaintiff's RFC, the ALJ expressly weighed
reports from Plaintiff's mother, which showed that Plaintiff was
functional but did not address the impact of Plaintiff's
substance abuse and medication noncompliance on Plaintiff's
symptoms. (A.R. 20.) Likewise, he considered and weighed
statements from other third parties, including two of Plaintiff's
friends. (A.R. 20-21.)

It was within this context of the ALJ's detailed review of
the record that the ALJ considered the opinion evidence. In the
course of reviewing the findings and opinion of Dr. Wilson, the
ALJ expressly gave the assessment significant weight because it
was consistent with the entirety of the record. (A.R. 19.) The
ALJ further stated the following concerning the expert opinions:

> As for the opinion evidence, Dr. Green provided a one
> line assessment on March 27, 2007. He stated he did not
> believe the claimant was able to work at this time. On
> April 11, 2007, the one line statement stated the
> claimant was disabled because of mental illness-
> psychosis (Exhibit 9F, pp. 1,2). I have not given
> significant weight to these brief, conclusory
> statements because they do not specifically delineate
> the claimant's limitations or indicate what factor
> prevents him from working. Additionally, they give
> no time frame for the alleged disability.
>
> The state agency found the claimant was limited to
> simple repetitive tasks with limited public contact
> due to a psychotic disorder (Exhibits 4F, 5F). I
> concur with this assessment as it is consistent
> with the entirety of the record.

(A.R. 20.)

With respect to declining to give significant weight to Dr.

20

1 Green's opinions, the ALJ stated several specific reasons that
2 accurately reflect some of the weaknesses of Dr. Green's
3 opinions, including the brevity of the opinions, the lack of
4 specificity as to functional limitations and as to time, and the
5 absence of an explanation of what specific factor rendered
6 Plaintiff disabled. These reasons have been held to be
7 legitimate. It is established that even with respect to a medical
8 opinion, a conclusional opinion that is unsubstantiated by
9 relevant medical documentation may be rejected. See Johnson v.
10 Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995). It is permissible
11 for an ALJ to prefer an opinion supported by specific clinical
12 findings and an explanation thereof over a check-off type of form
13 lacking an explanation of the basis for the conclusions. Crane v.
14 Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (citing Murray v.
15 Heckler, 722 F.2d 499, 501 (9th Cir. 1983)); see Batson v.
16 Commissioner of the Social Security Administration, 359 F.3d
17 1190, 1195 (9th Cir. 2004). Further, even where an expert's report
18 identifies characteristics that might limit a claimant's ability
19 to perform work on a sustained basis, if the report fails to
20 explain how such characteristics preclude work activity in the
21 claimant's case, it is appropriate and adequate for an ALJ to 1)
22 determine that the level of impairment stated is unreasonable in
23 light of the symptoms and other evidence in the record, and 2)
24 set forth that analysis. See Morgan v. Commissioner of Social
25 Security 169 F.3d 595, 601 (9th Cir. 1999).

26     Thus, the Court concludes that focusing narrowly on the
27 treatment of Dr. Green's opinions, the ALJ's weighing of Dr.
28 Green's opinions was supported by legally sufficient reasons that

1   were in turn supported by substantial evidence in the record.

2        The Court next turns to the ALJ's treatment of the other

3   opinions. In February 2006, non-examining state agency physician

4   Ikawa opined that Plaintiff had moderate limitations in

5   understanding, remembering, and carrying out detailed

6   instructions, and in the ability to interact appropriately with

7   the general public and coworkers, with no other significant

8   limitations; Plaintiff was able to sustain simple, repetitive

9   tasks and relate if contacts with coworkers and the public were

10  limited. (A.R. 286-88.) A generally consistent assessment by

11  state agency evaluator A. Middleton, Ph.D, dated December 26,

12  2006, followed; it stated without explanation a limitation with

13  respect to only public contact, but it did not refer to Dr.

14  Ikawa's recommendation of limited contact with coworkers. (A.R.

15  289-90.)

16       The opinion of a nontreating, nonexamining physician can

17  amount to substantial evidence as long as it is supported by

18  other evidence in the record, such as where it is consistent with

19  independent clinical findings or other evidence in the record,

20  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). The opinion

21  of a non-examining doctor that conflicts with a treating doctor's

22  opinion may constitute substantial evidence warranting rejection

23  of the treating doctor's opinion where the non-examining doctor's

24  opinion is based on opinions of other examining and consulting

25  physicians, which are in turn based on independent clinical

26  findings. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

27  Independent clinical findings can be either 1) diagnoses that

28  differ from those offered by another physician and that are

22

1  supported by substantial evidence, or 2) findings based on

2  objective medical tests that the other physician has not himself

3  or herself considered. Orn v. Astrue, 495 F.3d at 632.

4      Here, the opinions of the state agency physicians find

5  support in the opinion and independent findings of Dr. Wilson,

6  who in 2005 conducted a mental status exam, assessed intellectual

7  functioning and sensorium, and considered various histories.

8      The Court rejects Plaintiff's argument that the 2005 report

9  of Dr. Wilson was necessarily stale and useless or irrelevant.

10  Plaintiff cites Wier on Behalf of Wier v. Heckler, 734 F.2d 955,

11  963-64 (3d Cir. 1984) (non-examining sources' opinions concerning

12  adolescent claimant's condition, rendered during childhood at a

13  time before the development of a new impairment and a change in

14  the rate of development, were considered to be so stale as to be

15  virtually worthless); Morgan v. Sullivan, 945 F.2d 1079, 1080-81

16  (9th Cir. 1991) (in connection with a determination of the date of

17  onset of a mental impairment that had been characterized as

18  "progressive," it was noted that a mental impairment may manifest

19  itself over a period of time); Armstrong v. Commissioner of

20  Social Sec. Admin., 160 F.3d 587, (9th Cir. 1998) (where there was

21  an absence of medical evidence as to date of onset, it was

22  necessary to obtain the opinion of a medical expert as to the

23  date symptoms became disabling); and Nguyen v. Chater, 100 F.3d

24  1462, 1465 (9th Cir. 1996) (noting in connection with discussing

25  the source of an expert opinion and its consistency with the

26  record, that it is common knowledge that depression is one of the

27  most under-reported illnesses in the country because those

28  afflicted often do not recognize that their condition reflects a

23

1  potentially serious mental illness; thus, the fact that a
2  claimant may be one of millions of people who did not timely seek
3  treatment for a mental disorder was not a substantial basis on
4  which to conclude that an expert's assessment of a claimant's
5  condition is inaccurate).

6      The cases cited are factually distinct from the present
7  case. It is true that a more recent opinion may in some
8  circumstances be entitled to greater weight. Hunter v. Sullivan,
9  993 F.2d 31, 35 (4th Cir. 1993). However, in view of all pertinent
10  factors, including but not limited to the nature of Plaintiff's
11  impairment and symptoms, the absence of medical or other evidence
12  of a consistently deteriorating or progressively worsening
13  condition, and the nature of the treatment relationships
14  involved, the Court concludes that on review the record does not
15  compel a conclusion that the mere passage of two years rendered
16  Dr. Wilson's report irrelevant or insubstantial.

17      However, the Court finds more troubling Plaintiff's argument
18  that the process requires correction with respect to the ALJ's
19  reliance on Plaintiff's failure to seek or comply with his
20  medical treatment. Plaintiff cites Nguyen v. Chater, 100 F.3d
21  1462, 1465 (9th Cir. 1996) for the proposition that an ALJ cannot
22  dismiss an applicant's mental disorder simply because the person
23  has not sought extensive psychiatric treatment or has failed to
24  adhere to that treatment. (Brief. p. 10.) In Nguyen, as
25  previously noted, the court found insubstantial and erroneous the
26  ALJ's reasoning for adopting the opinion of a non-examining
27  psychologist and rejecting the opinion of an examining
28  psychologist concerning whether the claimant met a listing for

affective disorders. One factor relied upon by the ALJ was the

fact that the examining psychologist examined the claimant at the

request of the claimant's attorney. The court concluded that the

attorney's request was not a legitimate basis on which to

discount the doctor's opinion that the claimant had a severe

depression because the circumstances presented no basis for

questioning the source of the referral, such as an absence of an

objective basis for the opinion or any evidence of actual

improprieties. 100 F.3d at 1464-1465. The court continued its

analysis by citing a second basis for its conclusion that the

attorney's request for an examination was not a legitimate basis

to discount a doctor's opinion that a claimant had severe

depression:

> Second, it is common knowledge that depression is
> one of the most underreported illnesses in the country
> because those afflicted often do not recognize that
> their condition reflects a potentially serious mental
> illness. See, e.g., Warren E. Leavy, *Hidden Depression*,
> Chi. Trib., Feb. 1, 1996 at 7 (noting that nearly 17
> million adult Americans suffer from depression in a
> given year and that two-thirds of them do not get
> treatment). Thus, the fact that claimant may be one
> of millions of people who did not seek treatment for
> a mental disorder until late in the day is not a
> substantial basis on which to conclude that
> Dr. Brown's assessment of claimant's condition is
> inaccurate. As the Sixth Circuit has noted in finding
> invalid an ALJ's reasons for rejecting claimant's
> assertions about his depression, '[a]ppellant may have
> failed to seek psychiatric treatment for his mental
> condition, but it is a questionable practice to chastise
> one with a mental impairment for the exercise of poor
> judgment in seeking rehabilitation.' Blankenship v. Bowen,
> 874 F.2d 1116, 1124 (6th Cir.1989). (Emphasis added.)

Plaintiff further relies on Kangail v. Barnhart, 454 F.3d

627, 630 (7th Cir. 2006), in which the claimant suffered from

manic depression (bipolar disorder) but also had a history of

alcohol and drug (cocaine) abuse. The ALJ found that the abuse

1  was the cause of the disability; when the claimant stopped
2  abusing alcohol and drugs and took prescribed medication, her
3  condition improved, and she was able to work. There was evidence
4  in the record that the claimant tended indiscriminately to use
5  drugs and alcohol during her manic phases, which occurred as
6  frequently as monthly, and thus that her mental disorder could
7  precipitate substance abuse. The court also noted medical
8  literature that established that mental illness in general, and
9  bipolar disorder in particular, might prevent a sufferer
10 from taking her prescribed medicines or otherwise submitting to
11 treatment. Id. at 630-631. The ALJ's failure to consider this
12 possibility prevented the ALJ's reasoning from being a rational
13 basis for denying disability benefits to the claimant, and the
14 matter was returned to the SSA for further proceedings.

15     Here, as the foregoing summary of the medical evidence
16 reflects, the record contains a great deal of evidence that shows
17 that Plaintiff repeatedly failed to maintain full compliance with
18 his treating doctors' prescriptions concerning his medications.
19 Periods of noncompliance appear to have roughly coincided with
20 periods during which Plaintiff was out of custody or was not
21 subject to rigorous, external or official supervision or
22 monitoring of his compliance. Evidence from Plaintiff's mother to
23 the effect that Plaintiff needed to be reminded to take his
24 medication was expressly credited by the ALJ. (A.R. 20.) At least
25 one expert report noted that despite temporary improvement,
26 Plaintiff's symptoms waxed and waned. There was also ample
27 medical evidence in the form of repeated, historical reports that
28 even with medication, Plaintiff continued to suffer some

1  hallucinations and paranoia. Further, Plaintiff testified that
2  even though his medication helped, about three times a month the
3  medication would not work.

4      This evidence, along with the other medical evidence of
5  record, reveals that Plaintiff suffered a severe mental
6  impairment with symptoms so extreme that Plaintiff required
7  repeated in-patient treatment. In determining Plaintiff's RFC,
8  the ALJ relied on reports of functionality that were necessarily,
9  logically based on an assumption that despite Plaintiff's
10 impairment, Plaintiff was capable of complying with his
11 prescribed treatment, or that his impairment did not present or
12 contribute to any justification for noncompliance.[8] However, the
13 circumstances surrounding Plaintiff's failure to take his
14 prescribed medications were not examined or evaluated by the ALJ,
15 who found that Plaintiff was functional when medicated and simply
16 concluded on the basis of such evidence that Plaintiff was not
17 disabled.

18      Impairments that can be controlled effectively with
19 medication are not disabling for the purpose of determining
20 eligibility for SSI benefits. <u>Warre v. Commissioner of Social</u>
21 <u>Security Administration</u>,439 F.3d 1001, 1006 (9th Cir. 2006). Title

22 _____

23      [8] In reviewing the medical evidence and determining the RFC, the ALJ expressly gave significant weight to
    Dr. Wilson's opinion concerning Plaintiff's RFC and stated that it was consistent with the entirety of the record. The
24  ALJ expressly mentioned Dr. Wilson's findings that Plaintiff could relate and interact with coworkers and
    supervisors as long as he was on his medication. (A.R. 19.)  Further, in determining that Plaintiff's subjective
25  complaints were not credible to the extent inconsistent with the RFC, the ALJ expressly relied on the fact that
    Plaintiff's bizarre behavior and hospitalizations appeared to be tied to periods of noncompliance with medications;
26  Plaintiff did quite well on several medications when he was compliant; Plaintiff's difficulties focusing and
    concentrating were generally tied to noncompliance with medication; and if Plaintiff were compliant with
27  medication, then it appeared he would function quite well. (A.R 19-20.) Plaintiff does not expressly raise any issue
    concerning the ALJ's reasoning regarding Plaintiff's credibility. The Court notes the ALJ's reasoning on this issue
28  because it demonstrates how important and indeed, pivotal, Plaintiff's failure to comply with treatment was
    throughout the ALJ's decision and how it affected the ALJ's evaluation of all the evidence, including the medical
    evidence of record, Plaintiff's subjective complaints and third party reports, and Plaintiff's activities of daily living.

1  20 C.F.R. § 416.930 (2008) provides:

2        (a) What treatment you must follow. In order to
3        get benefits, you must follow treatment prescribed by
       your physician if this treatment can restore your
       ability to work, or, if you are a child, if the
4        treatment can reduce your functional limitations so
       that they are no longer marked and severe.
5        (b) When you do not follow prescribed treatment. If you do
   not follow the prescribed treatment without a good reason, we
6    will not find you disabled or blind or, if you are already
   receiving benefits, we will stop paying you benefits.
7        c) Acceptable reasons for failure to follow
       prescribed treatment. We will consider your physical
8        mental, educational, and linguistic limitations
       (including any lack of facility with the English
9        language) when determining if you have an acceptable
       reason for failure to follow prescribed treatment. The
10       following are examples of a good reason for not
       following treatment:
11       (1) The specific medical treatment is contrary to
       the established teaching and tenets of your religion.
12       (2) The prescribed treatment would be cataract
       surgery for one eye when there is an impairment of the
13       other eye resulting in a severe loss of vision and is
       not subject to improvement through treatment.
14       (3) Surgery was previously performed with
       unsuccessful results and the same surgery is again
15       being recommended for the same impairment.
       (4) The treatment because of its enormity (e.g.
16       open heart surgery), unusual nature (e.g., organ
       transplant), or other reason is very risky for you; or
17       (5) The treatment involves amputation of an
       extremity, or a major part of an extremity.
18

19       In Soc. Sec. Ruling 82-59, the SSA states its policy, which

20   is that an individual who would otherwise be found to be disabled

21   but who fails without justifiable cause to follow treatment

22   prescribed by a treating source which the SSA determines can be

23   expected to restore the individual's ability to work cannot by

24   virtue of such failure be found to be under a disability. Id. p.

25   1. The SSA may make a determination that an individual has failed

26   to follow prescribed treatment only where all of the following

27   conditions exist: 1) The evidence establishes that the impairment

28   precludes engaging in any substantial gainful activity; 2) the

   impairment has lasted or is expected to last for twelve

                                  28

continuous months from onset or is expected to result in death;
3) treatment which is clearly expected to restore capacity to
engage in any substantial gainful activity or gainful activity
has been prescribed by a treating source, and 4) the evidence of
record discloses that there has been refusal to follow prescribed
treatment. Id. p. 1. Where a failure is found, a determination
must also be made as to whether or not failure to follow
prescribed treatment was justifiable. Id. The SSA will determine
whether the medical evidence demonstrates that the prescribed
treatment will restore ability to work. Id. p. 2. The claimant or
beneficiary should be given an opportunity to express fully the
specific reasons for not following the prescribed treatment, and
the record should reflect the reason or reasons; it may be
necessary to re-contact the treating source for substantiation or
clarification. Failure to follow a prescription is justifiable if
an individual is unable to afford prescribed treatment which he
or she is willing to accept but for which free community
resources are unavailable, or if any duly licensed treating
medical source who has treated the claimant advises against the
treatment. Id. p. 4. The stated reasons are not exhaustive. Id.
p. 4.

     With respect to determining whether a claimant had good
reason for failing to follow prescribed medical treatment, an ALJ
cannot assume that a claimant's condition is remediable; an ALJ
must examine the medical conditions and personal factors that
bear on whether the claimant can reasonably remedy the condition.
Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993) (discussing a
claimant's obesity).

1    The ALJ's reasoning here reflects implied conclusions that

2  absent medication, Plaintiff would have suffered much greater,

3  and arguably disabling, functional limitations, and that

4  treatment by medication rendered Plaintiff able to engage in

5  work. The reasoning set forth by the ALJ is devoid of any

6  consideration of how and/or whether Plaintiff's demonstrated

7  mental impairment affected Plaintiff's ability to comply with

8  prescribed treatment or otherwise contributed to a justification

9  for noncompliance.

10    Defendant argues that Nguyen v. Chater does not apply

11 because it related only to seeking treatment, not complying with

12 treatment, and that Kangail v. Barnhart does not apply because

13 Plaintiff cites to no facts indicating that his mental impairment

14 prevented him from adhering to treatment. Defendant also points

15 to evidence that might warrant a finding that Plaintiff's recent

16 refusal to take medications might have been precipitated by his

17 stated desire to receive SSI benefits. However, these matters

18 were not considered or addressed by the ALJ, and this Court is

19 limited to reviewing evidence in the record and the findings and

20 reasoning set forth by the ALJ. Connett v. Barnhart, 340 F.3d

21 871, 874 (9th Cir. 2003). The medical evidence relied on by the

22 ALJ does not address whether or how Plaintiff's impairment, which

23 involved repeated instances of delusions and hallucinations, or

24 his medications, affected his ability to comply with treatment or

25 otherwise presented any justification for noncompliance. No

26 treating source or other source has opined on the matter. The ALJ

27 repeatedly referred to and relied upon the connection between

28 noncompliance with medication and symptoms, hospitalization, and

1  functionality not only in the course of evaluating Plaintiff's

2  subjective complaints, but also in assessing Plaintiff's ability

3  to function and in evaluating the overall medical evidence of

4  record. (A.R. 19-20.) However, these findings were not

5  accompanied by any consideration of whether any failure to comply

6  with treatment was justified in light of the circumstances

7  surrounding the repeated failures of the seriously disturbed

8  claimant to take his medication.

9      In view of the nature and extent of Plaintiff's impairment,

10 and in the absence of any consideration of the issues relating to

11 any justification for Plaintiff's noncompliance, the ALJ's

12 reasoning concerning the medical evidence of record and

13 Plaintiff's RFC lacks legitimate rational force, and the matter

14 must be returned for further proceedings.

15     VI. <u>Recommendation</u>

16     Based on the foregoing, the Court concludes that the ALJ's

17 decision was not supported by substantial evidence in the record

18 as a whole and was not based on proper legal standards.

19     Accordingly, it IS RECOMMENDED that

20     1. Plaintiff's social security complaint BE GRANTED, and

21     2. The matter BE REMANDED pursuant to sentence four of 42

22 U.S.C. § 405(g) for further consideration, consistent with this

23 decision, of Plaintiff's status as disabled, including whether or

24 not Plaintiff a) suffered from a severe impairment or

25 impairments, b) could perform any past relevant work, and c) if

26 appropriate, whether on the basis of the Plaintiff's age,

27 education, work experience, and residual functional capacity, he

28 could perform any other gainful and substantial work within the

1  economy; and

2      3. Judgment BE ENTERED for Plaintiff Miguel A. Molina and

3  against Defendant Michael J. Astrue.

4      This report and recommendation is submitted to the United

5  States District Court Judge assigned to the case, pursuant to the

6  provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the

7  Local Rules of Practice for the United States District Court,

8  Eastern District of California. Within thirty (30) days after

9  being served with a copy, any party may file written objections

10 with the court and serve a copy on all parties. Such a document

11 should be captioned "Objections to Magistrate Judge's Findings

12 and Recommendations." Replies to the objections shall be served

13 and filed within ten (10) <u>court</u> days (plus three days if served

14 by mail) after service of the objections. The Court will then

15 review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636

16 (b)(1)(C). The parties are advised that failure to file

17 objections within the specified time may waive the right to

18 appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d

19 1153 (9th Cir. 1991).

20

21 IT IS SO ORDERED.

22 **Dated:   January 10, 2010**                    **/s/ Sandra M. Snyder**
                                          UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28